S.I.R.P.P.

FILED - KZ
December 28, 2022 4:18 PM
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
___ems___ Scanned by ES /12/29

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

399 Federal Bldg 110 Michigan St NW Grand Rapids MI 49503, (616) 456-2381

NEVIN P. COOPER-KEEL, JD
    Plaintiff Pro Se

V.

Case No.

**1:22-cv-1236**
Hala Y. Jarbou
United States District Judge

Hon.

GARRETT KEEL-WORRELL,
    Defendant.

## VERIFIED COMPLAINT WITH JURY DEMAND

Plaintiff: Nevin P. Cooper-Keel, JD
Plaintiff
3127 127th Avenue
Allegan, MI 49010
616.329.7077
Nevincooperkeel@gmail.com

Garrett Keel-Worrell
Defendant
34700 Road 140
Visalia, CA 93292
559.284.0280

        /

Plaintiff, Nevin Cooper-Keel, states::

**Statement of Jurisdiction**

1. I reside in Allegan, Michigan, at the above captioned address.

2. Defendant resides in Visaliya, California, at the above captioned address.

3. The amount in controversy exceeds seventy five thousand dollars ($75,000.00).

4. Jurisdiction in This Court is proper, pursuant to diversity jurisdiction.

**Statement of Facts**

5. Defendant is my 44 year old cousin.

6. Defendant has been engaged in harassing and stalking behavior, inter alia, towards me for many years, much of which exceeds statutes of limitations individually.

7. Like in 2015, after I was called by a friend of mine to notify me that Defendant was in the main restaurant in my hometown of Allegan, drunk and frivolously defaming me to anyone that would listen to him, and when I called him and asked him to stop doing that, he came to my house with a friend of his, wanting me to come outside to fight, and when I refused, he broke into my garage and removed my three children's pet goat that had just died that I had not yet buried, and hung it on my mail box that was right in front of my children's bedrooms. (Exhibit 1).

8. Exhibit 1 is relevant because it is part of a continuing pattern of this type of behavior.

9. On December 28th, 2020, Defendant texted me saying I deserve to be shot.

10. Defendant then said that he would be traveling to Michigan in a few days to see me.

11. Defendant testified against me in my unrelated divorce trial pertinent to custody of my children in March, 2021.

12. One week before he was scheduled to testify in my divorce, he sent a letter to my mother and our aunt.

13. Defendant had not spoken to my mother or our aunt for years before that.

14. Defendant had said many times that he looked forward to urinating on our aunt's grave.

15. My mother, our aunt, and Defendant's mother, own three undivided third interests in our family farm.
16. The purpose of the letter Defendant sent to my mother and our aunt was to extort them into selling him their interests in the farm in exchange for his testimony in my divorce trial.
17. By extension, Defendant was trying to extort me, as a party in that divorce case, by maliciously offering to exchange his hostile testimony toward me for the family farm.
18. Defendant admitted under cross examination in that divorce trial to having sent that letter the week before.
19. Defendant vacationed with my then wife and my children while I was divorcing her in April, 2021.
20. Defendant also took a trip to Las Vegas with my ex wife, about a month after our divorce was finalized in November, 2021.
21. Defendant's purpose of vacationing with my then wife and children and later ex wife was to inflict emotional distress on me.
22. Before I filed for divorce, Defendant and my then wife did not like each other.
23. On July 13th, 2021, I called a rebuttal witness, Mitch Yonkers, in my divorce trial who testified via zoom.
24. My divorce trial was being broadcast on youtube.
25. Defendant was watching the divorce trial on youtube.
26. Right at the moment I asked my rebuttal witness if Defendant was an honest or dishonest person, and before my witness answered the question, my witness remarked "what the hell – Garrett just texted me that he's watching me".

27. Before my witness answered, I said to the biased and unethical judge Roberts Kengis, who himself had been stalking me on LinkedIn and social media a few weeks earlier – "isn't that witness intimidation", which he just shrugged at.
28. Defendant did text Mitch Yonkers "I am watching you" while Mr. Yonkers was testifying.
29. Defendant was in California at the time he texted Mr. Yonkers.
30. Mr. Yonkers was in Michigan while testifying in my divorce, when texted by Defendant.
31. I reported it to the FBI a month or two later.
32. The FBI is too busy intimidating domestic political opposition and getting twitter to stifle free speech to bother with the crime of witness intimidation crossing state lines.
33. The statute of limitations is not over for them to do something about it.
34. In or around September, 2021, Defendant texted me, asking me to get my mom and aunt to give him and his sister two thirds of the family farm, even though his own mother only owns a third of it.
35. I asked him to stop texting me then.
36. Defendant refused to stop texting me.
37. I then blocked his phone number from my phone.
38. The farm I live on is about 70 acres – 30 of it tillable farm land, 40 of it forest.
39. Defendant and I have both had permission to hunt on it for many years.
40. On June 22nd, 2022, Defendant emailed me saying how he was just coming out to do some maintenance on some of his deer blinds and that "There will be NO

reason for anyone to harass me, confront me, speak to me, or engage with me in any way."

41. Defendant then emailed me the next day offering to help me bail hay.

42. I responded to his offer to help bail hay by reminding him that I'd already blocked his phone number a year before, that he was not the least bit welcome with me, and twice told him to "stop contacting me".

43. On June 25th, 2022, I was in the field at the farm that I lease for harvesting alfalfa, and was on my tractor.

44. My neighbor, Karl Avery, was on the hay wagon in tow behind the tractor, helping me stack bailed hay.

45. Then a pickup truck that I didn't recognize stopped across the street from the field I was in and just sat and watched.

46. After a minute or so, I stopped the tractor and asked who it was.

47. Defendant, from within the truck, said "you know who it is".

48. At that point, I did know who it was and asked him what he wanted.

49. He said he wanted to help bail hay.

50. I responded that I don't want his help and I want him to leave me alone.

51. Defendant then drove off.

52. I left my hay baler outside in my yard that night.

53. When I started it up the next day, the mechanism on it that ties the knots on the hay bails was broken in several places.

54. The hay baler was working fine the evening before, and did not break while in operation in the field the next day – it was broken when I entered the field with it the next day.

55. I think Defendant probably sabotaged and broke my hay baler that night after I'd shut it off for the day.

56. On or about November 11th, 2022, I was in the pole barn I hold the sole lease for at the farm I live on and the barn door was open.

57. Defendant entered the barn and cornered me in it.

58. I recorded that encounter.

59. Defendant asked me if I wanted any venison from him.

60. I told him I don't want any venison from him (and thought to myself, because he would probably urinate on it before giving it to me).

61. On November 13th, I took a guest of mine, Justin Parker, to see a few spots for him to hunt on the farm, before deer season began Nov 15.

62. Mr. Parker and I had left my house on foot to walk out to a field on the farm.

63. Defendant was just driving past my house when Mr. Parker and I were leaving it on foot.

64. Defendant waved to Mr. Parker as he drove by.

65. Defendant was driving by my house to stalk and harass me.

66. Defendant then parked his car near the barn across the street from my house.

67. Defendant's parking spot was before my house on his route to get to it and did not require him to drive past my home.

68. Defendant then followed myself and Mr. Parker out to the field I was showing to Mr. Parker.

69. Once Defendant approached me and Mr. Parker in that field, he began telling me many offensive things.

70. One of the things Defendant said to me is that my children do not love me.

71. I told Defendant repeatedly to stop talking to me.

72. Mr. Parker and I began walking back to my house.

73. I repeatedly asked Defendant to stop following us.

74. I offered to Defendant that if he was not out there to hunt, that Mr. Parker and I would wait there for Defendant to leave, because we did not want to be around him.

75. Defendant refused to leave or stay, and only followed us.

76. Defendant continued to say offensive things to me and about me the entire time he followed me.

77. Defendant mentioned the lawsuit my mother and aunt have filed against his mother while following me.

78. Defendant intended to use his continued harassment and present threat to me to try to extort me into getting my mother and aunt to submit to his mother's demands on the family farm.

79. Defendant followed me all the way up to my home.

80. Once Defendant had entered my lawn, I told Defendant that he was now trespassing.

81. Once I reached my home and Defendant was still following me, I called 911.

82. I have 16.5 minutes of video of the entire encounter, up to the point I called 911.

83. Defendant then attempted to break into my garage once I called 911.

84. I repeatedly told Defendant to leave my home.

85. Defendant waited in my driveway until the police arrived.

86. Police then instructed Defendant to leave, which he complied with.

87. At some point *after* Defendant followed me up to my home and attempted to break into my garage, Defendant called the DNR and reported to them that I was harassing him while he was hunting.

88. Defendant lied to them to purposely instigate a malicious prosecution against me.

89. I was charged with 'hunters harassment' on November 30th, 2022.

90. I will not be taking any plea in that case and as soon as it is dismissed or I am acquitted, I will be wanting to add a malicious prosecution claim to this case.

91. Defendant also continually harassed my guest – by extension, me – during that encounter.

92. Defendant then attempted to stop Mr. Parker from driving out of my driveway.

93. Defendant was openly carrying a crossbow during this entire encounter.

94. Defendant's other threatening conduct during the November 13th encounter, plus being armed with a weapon, made me fear what other criminal conduct he might engage in with his weapon.

95. I was instructed by the 911 operator during the call to go inside and lock my door until police arrive.

96. I felt unsafe to leave my home while Defendant waited in my driveway.

97. When Defendant attempted to break into my garage, he was armed with the crossbow.

98. At that time, I was unarmed.

99. At that time, I was desiring to avoid any further altercation with the crazed Defendant attempting to break into my garage.

100. Defendant has inherited, or derived from his inheritance, everything he owns.

101. I have inherited almost nothing.

102. I have built numerous businesses that have made money, some that regularly grossed over one hundred thousand dollars per year.

103. All the time Defendant has caused me to be taken away from my businesses amounts to hundreds of thousands of dollars I could have made in just the last two years, but for Defendant's disruptions to my otherwise normal business pursuits.

104. Defendant inherited a business called "Sequoia Horticultural Products".

105. Upon info and belief, Defendant's income from that business is approximately two hundred thousand dollars per year.

106. Defendant owns a home in Visalia, CA, worth approximately one million dollars.

107. Defendant primarily resides at that home in Visalia, CA.

108. Defendant owns 160 acres in Arkansas.

109. Defendant owns an interest in a home in Allegan, MI, worth approximately five hundred thousand dollars.

110. Defendant owns an interest in a farm in Allegan, MI, worth approximately five hundred thousand dollars.

111. In 2015, Defendant came to my home drunk and wanting me to come outside to engage in a fist fight with him.

112. When I refused to come outside, he broke into my unlocked garage with the intent to commit a crime therein.

113. Inside the garage, he found my children's goat that had just died that day, which I'd not yet buried.

114. Defendant then hung the goat on my mailbox.

115. Defendant admitted when testifying in my divorce trial that he knew my children's bedroom windows were just overlooking that mailbox.

116. In 2019, while he and I were both hunting on our family's farm, Defendant was mad that I (lawfully) shot two deer and he hadn't gotten any, so he grabbed my shotgun and threw it on the ground with such force that it broke the scope off of my gun.

117. I demand a jury trial in this case.

## Count One - Harassment

118. Defendant made many unwanted contacts with me as described herein.

119. Defendant knew those contacts were unwanted by me.

120. Defendant's repeated unconsented contacts with me caused me to suffer emotional distress.

121. Defendant's repeated unconsented contacts with me have caused me wage loss.

## Count Two – False Imprisonment

122. I was restrained to my home by Defendant on November 13th, while he waited outside with a weapon.

123. I suffered emotional distress during and after the incident.

124. I suffered wage loss from the incident.

## Count Three - Extortion

125. Defendant tried to exchange his hostile and false testimony against me in my divorce trial, for the rest of our family handing him over the family farm.

126. I was one of his targeted victims in his extortion scheme.

127. I suffered emotional distress from Defendant's extortion attempt.

128. I suffered wage loss from Defendant's extortion attempt.

**Count Four – Invasion of Privacy**

129. Defendant following me up to my home and attempting to break into my garage on November 13th, 2022, was an unauthorized intrusion to my seclusion.

130. The intrusion was highly offensive and objectionable to myself, and any reasonable person.

131. The matter intruded upon was my dwelling place and it was a private dwelling only I own the possessory rights to.

132. Defendant's intrusion caused anguish and suffering to me.

133. Defendant's intrusion caused me to suffer wage loss.

**Count Five – Intentional Infliction of Emotional Distress**

134. The foregoing described acts of Defendant were extreme and outrageous conduct.

135. Defendant acted with intent to cause severe emotional distress in me.

136. Defendant's extreme and outrageous conduct did cause emotional distress in me.

137. The emotional distress I experienced from all of this was severe.

**Damages**

138. The amount in controversy exceeds seventy five thousand dollars.

139. One million dollars is the exact amount of damages Defendant owes me for my pain and suffering and wage loss from his continued crimes and torts against me.

140. If Defendant disputes this, I would prefer the amount of damages be decided at trial by a jury.

WHEREFORE, please schedule this case for a jury trial.

Respectfully Submitted by:
_____
Nevin P. Cooper-Keel, JD – Plaintiff pro se 12.28.2022