# EXHIBIT A

# Cooper-Keel v. Cooper-Keel

Court of Appeals of Michigan

August 11, 2022, Decided

No. 359288

**Reporter**
2022 Mich. App. LEXIS 4714 *; 2022 WL 3333251

NEVIN **COOPER-KEEL**, Plaintiff-Appellant, v BARBARA **COOPER-KEEL**, Defendant-Appellee.

**Notice:** THIS IS AN UNPUBLISHED OPINION. IN ACCORDANCE WITH MICHIGAN COURT OF APPEALS RULES, UNPUBLISHED OPINIONS ARE NOT PRECEDENTIALLY BINDING UNDER THE RULES OF STARE DECISIS.

**Prior History:** [*1] Allegan Circuit Court. LC No. 2020-062926-DM.

_Cooper-Keel_ v. _Cooper-Keel_, 2021 Mich. App. LEXIS 3567 (Mich. Ct. App., June 9, 2021)

**Counsel:** For NEVIN **COOPER-KEEL**, Plaintiff - Appellant: Self-Represented Party.

For BARBARA **COOPER-KEEL**, Defendant - Appellee: DOLORES TRESE.

**Judges:** Before: RICK, P.J., and BOONSTRA and O'BRIEN, JJ.

## Opinion

PER CURIAM.

After a six-day bench trial, the trial court entered a judgment of divorce dissolving the marriage of plaintiff, Nevin _Cooper-Keel_, and defendant, Barbara _Cooper-Keel_. Plaintiff appeals as of right, challenging various decisions by the trial court and alleging multiple due-process violations. Finding no error, we affirm.

I. RELEVANT FACTS AND PROCEEDINGS

Plaintiff and defendant married in October 2011. They had two children, DCK and ACK, both of whom were minors when their parents divorced. Plaintiff filed for divorce in June 2020, and defendant filed an answer and counterclaim for divorce the following month. Both parties sought sole physical custody of the children. After conciliation conferences with both parents and interviews with the children, the Allegan County Friend of the Court (FOC) recommended a temporary order granting (1) defendant sole physical and legal custody of the children and (2) plaintiff parenting time as agreed upon by the parties [*2] or, if the parties could not agree, according to the FOC's parenting-time policy. Plaintiff filed objections to the recommended temporary order, and an evidentiary hearing ensued. Following the hearing, the trial court adopted the FOC's recommended temporary order.

At the eventual divorce trial, testimony primarily centered on the parents' relationship with the children, the parents' relative mental health, and an incident that occurred at plaintiff's house in December 2020.

Regarding the children, defendant contended that plaintiff was pushing the children to play the sports that he wanted them to play, regardless of the children's desires. In particular, defendant believed that plaintiff was endangering DCK's mental health by pushing him to play hockey when DCK did not want to. She testified that plaintiff tried to manipulate DCK by threatening to take away his privileges if he did not play hockey; punished him for not playing by doing things like taking away his phone; and said things that the child perceived as belittling and

hurtful. DCK's counselor testified that she talked with the boy about recent behavioral issues, and those talks often revolved around hockey and plaintiff. **[*3]** According to defendant, DCK was also experiencing increasingly severe nosebleeds, possibly because of the stress he was under. Representing himself, plaintiff sought to establish that DCK wanted to play hockey but defendant would not let him, and that her refusal was partially to blame for DCK's declining grades, behavioral problems, and possibly even his nosebleeds. Plaintiff also contended that defendant was using DCK's counselor to alienate him from plaintiff.

On the issue of mental health, plaintiff offered a psychological expert to testify about his mental state. Using the expert's testimony and the fact that defendant had a past diagnosis of postpartum depression, plaintiff argued that he was better suited to parent the children.

As for the December 2020 incident, testimony about it was inconsistent. Plaintiff testified that he bailed a man out of jail that he had known since high school named Matt Warnock, and asked Warnock to help drive two cars from Benton Harbor to plaintiff's home as part of plaintiff's bail-bond business. The cars, plus $20,000 in cash, were collateral for a $50,000 bond. According to plaintiff, while he was still in his driveway after having returned from **[*4]** Benton Harbor, Warnock tried to rob him. Plaintiff also testified that he was sitting in his house when he heard something outside and saw that Warnock had shown up with a gun and two armed friends, though it is unclear whether this happened on a different or the same night. Either way, plaintiff sent a screenshot of himself to Shannon Hall, who testified on defendant's behalf, with an accompanying text stating that he was sitting in his house in a bullet-proof vest, with loaded guns, on what he described as a "war footing." Defendant testified that she was not sure whether plaintiff was ever really in danger and surmised that the episode could have been a delusion brought on by plaintiff's consumption of alcohol and marijuana. At the time, however, defendant was sufficiently worried to move for an ex parte order suspending plaintiff's parenting time until more information about the incident could be obtained.

Following the divorce trial, the trial court awarded defendant sole physical and legal custody of the children and awarded plaintiff parenting time in accordance with the FOC's parenting-time policy. The court found that the children had established custodial environments with **[*5]** both parents and that clear and convincing evidence was required to change custody. On the best-interest factors, MCL 722.23(a) through (*l*), the court found that the parents were equal with regard to best-interest factors (a) (love, affection, and other emotional ties); (c) (capacity and disposition to provide for children's material needs); (e) (permanence of the family unit); (f) (moral fitness), and (k) (domestic violence), and that the remaining factors favored defendant.

II. DECISIONS RELATED TO CUSTODY

Plaintiff first argues that the trial court's custody decision was an abuse of discretion because (1) the court's best-interest determination was against the great weight of the evidence and (2) there was not clear and convincing evidence that awarding defendant sole physical and legal custody was in the children's best interests. We disagree.

"All custody orders must be affirmed on appeal unless the circuit court's findings were against the great weight of the evidence, the circuit court committed a palpable abuse of discretion, or the circuit court made a clear legal error on a major issue." MCL 722.28. We review for an abuse of discretion a trial court's ruling regarding which party is granted custody. *Elahham v Al-Jabban*, 319 Mich App 112, 126; 899 NW2d 768 (2017). For purposes **[*6]** of a child-custody determination, an abuse of discretion exists when the result is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias. *Id.* We review a trial court's findings on the best-interest factors under the great weight of the evidence standard. MCL 722.28; *McRoberts v Ferguson*, 322 Mich App 125, 133-134; 910 NW2d 721 (2017). A finding of fact is against the great weight of the evidence if the evidence clearly preponderates in the opposite direction. *Pennington v Pennington*, 329 Mich App 562, 570; 944 NW2d 131 (2019).

The trial court found the parties equal for best-interest Factors (a), (c), (e), (f), and (k), and that the remaining factors favored defendant. Of those factors favoring defendant, plaintiff challenges only Factors (b) and (g).

In relevant part, Factor (b) addresses each parent's capacity and disposition "to give the child[ren] love, affection, and guidance . . . ." MCL 722.23(b). The trial court found both parents capable of giving the children love, affection,

Case 1:22-cv-01236-HYJ-SJB ECF No. 14-2, PageID.110 Filed 02/27/23 Page 4 of 10

Page 3 of 9
2022 Mich. App. LEXIS 4714, *6

and guidance, but found that defendant had more of a disposition to do so. The trial court agreed with defendant that plaintiff was "hyper-focused" on the children participating in and excelling at hockey and that this was having a detrimental effect, particularly [*7] on DCK. Defendant testified that DCK felt that he could not be himself around plaintiff, that plaintiff did not listen to him, and that plaintiff was pushing him in a direction that he did not want to go while not being supportive of what actually interested him. Whereas DCK wanted to take a break from hockey and soccer and participate in a cross-country running program, plaintiff threatened him with loss of privileges if he did not play hockey, and DCK's counselor testified that DCK was angry about the hurtful and belittling things plaintiff said to him.

Plaintiff's unwillingness to recognize the detrimental effect that his approach was having on DCK was evinced by plaintiff's insistence that any problems DCK was having were attributable to defendant's keeping him from playing hockey and that DCK wanted to play hockey, despite the boy's protestations to the contrary; plaintiff repeatedly insinuated that things would sort themselves out if DCK just got back on the ice. Plaintiff implied that DCK's nosebleeds were not serious and could be attributable to the stress of defendant's not allowing DCK to play hockey. Plaintiff's unwillingness to listen to the boys, to understand their emotional [*8] needs, and to provide them with guidance in the area of sports was also evidenced by his treatment of his youngest child, ACK. ACK excelled at two sports and was excited about the prospect of playing goalie in soccer, but plaintiff was so determined that he play hockey that he belittled ACK's interest in soccer and told him that he was no longer going to pay for him to play.

Contrary to plaintiff's argument on appeal, the trial court did not conclude that plaintiff was pushing the boys to excel at hockey to make up for plaintiff's own lack of accomplishment in the sport. The court did not speculate about the motivation for plaintiff's actions, but instead focused on the effect of plaintiff's actions on the children. Likewise, plaintiff misconstrues the trial court's reasoning when he claims that the trial court deemed that plaintiff's work as a bail bondsman was too dangerous to allow him to have custody of his children. The court made clear that it was not the work itself that could put the children at risk, but plaintiff's poor judgment that created potentially dangerous situations. The court focused on how plaintiff's judgment and actions affected his children, not on plaintiff's [*9] athletic record, plaintiff's motivation, or the dangers inherent in plaintiff's work.

Our review of the record convinces us that the trial court's findings regarding Factor (b) were not against the great weight of the evidence.

The trial court's findings regarding Factor (g) were also not against the great weight of the evidence. Factor (g) addresses the mental and physical health of the parents. MCL 722.23(g). Focusing on the fact that defendant was once diagnosed with depression while his psychological expert, Kaisey Foltz, testified that plaintiff revealed "no evidence to diagnose any kind of mental illness," plaintiff argues that Factor (g) should have favored him.

Plaintiff points to no record evidence demonstrating that defendant currently suffers from mental health issues that affect her ability to parent. Defendant testified that she had postpartum depression after the birth of each child, but she addressed the condition and was no longer taking any medication. In addition, the trial court stated that it had not observed any evidence of mental illness or characteristics of defendant's mental health that caused the court concern. While plaintiff alleged that defendant was schizophrenic, he [*10] explained under cross-examination that he meant that defendant was "presenting things to this Court that are so far removed from reality that I don't think a reasonable person could think them . . . ." Plaintiff's answer illustrated that labeling defendant as "schizophrenic" was merely an expression of plaintiff's disagreement with defendant's testimony.

Further, when assessing Factor (g), a trial court may consider more than formal mental health diagnoses. See *MacIntyre v MacIntyre (On Remand)*, 267 Mich App 449, 457; 705 NW2d 144 (2005) (affirming the trial court's assessment of Factor (g) in favor of plaintiff on the basis of ample record evidence of defendant's "uncontrollable and inappropriate displays of anger in the child's presence"). The relevant question is whether a parent's mental health affects his or her ability to parent. See *Wright v Wright*, 279 Mich App 291, 302; 761 NW2d 443 (2008) (affirming that Factor (g) favored neither party despite mother's being diagnosed with a mild form of depression because it did not interfere with her ability to parent).

In support of its conclusion that Factor (g) favored defendant, the trial court found that plaintiff displayed a number of concerning tendencies that plaintiff's psychological expert attributed to individuals with plaintiff's psychological profile. Quoting **[*11]** from Foltz's report, the trial court noted that plaintiff tested, among other things, "dominant and impulsive." The report stated that people with plaintiff's psychological profile may have learned "that being manipulative is how one gets along in the world," and that "[t]hey may see the world as dog eat dog in a place where being top dog is the only solution." The report also suggested that such people have little insight into their manipulativeness. The report further detailed that individuals with plaintiff's profile may "selectively report" to "avoid[] conflict or negative consequences," they may "have trouble with the law or authority figures," and they may tend to see the difficult situations in which they find themselves to be the result of other people's actions rather than as consequences of their own behavior. According to the trial court, throughout the divorce trial, it observed that plaintiff's behavior conformed to these aspects of the psychologist's report.

The record supports the trial court's observation. The trial transcripts provide multiple examples of plaintiff's attempt to dominate witnesses by cutting them off, arguing with them in an attempt to get them to provide **[*12]** the answers that he wanted, and making inappropriate comments to them. Testimony also demonstrated that plaintiff used manipulation to get what he wanted. Plaintiff's mother testified that plaintiff withheld the children from her while she and her husband were having a dispute with plaintiff, and defendant testified that plaintiff took away DCK's phone as punishment for not playing hockey and threatened not to pay for ACK's soccer to get him to drop his interest in being a goalie. As to blaming others for situations caused by his own behavior, plaintiff's position throughout the trial was that DCK wanted to play hockey but defendant would not let him, and that defendant's keeping DCK from playing hockey was the source of any problems that DCK was having, including any tension between DCK and plaintiff. Similarly, plaintiff blamed DCK's counselor for unwittingly alienating DCK from him. As for trouble with authority figures, plaintiff displayed his disrespect for the court through repeated argumentativeness, by questioning the trial court's grasp of the facts, and by arguing about the trial court's rulings on defendant's objections.

For purposes of Factor (g), the trial court also considered **[*13]** plaintiff's allegation of an affair between defendant and her best friend, and the lack of evidence to support it. Early in the case, plaintiff accused defendant of having an affair with her best friend on the basis of photographs and a video showing the friend's arm draped over defendant's shoulder at a concert two years earlier. Plaintiff insisted that the video showed the friend kissing defendant, groping defendant's breast, and reaching for defendant's crotch. Plaintiff also made other allegations, such as that defendant had a sexual affair with her friend and her friend's husband, and that the couple prostituted defendant. Testifying at an evidentiary hearing, defendant's friend categorically denied plaintiff's accusations and stated that she was embarrassed to have been dragged into these proceedings because of plaintiff's baseless accusations. Having reviewed the photos, watched the video, and considered plaintiff's accusations, the trial court "completely disagree[d]" with plaintiff's interpretation of the evidence. The court observed that plaintiff "has somehow imagined in his head that there's something there when it's not there and that really gives [the court] a lot of **[*14]** concern about [plaintiff's] mental state." The court also expressed concerns with plaintiff's reaction to events on the night of the December 2020 incident, and noted Foltz's observation that when people with plaintiff's profile "use drugs or alcohol[,] their impulsive behavior may get worse and they may do things that backfire or cause them severe problems." The court surmised that that might have been what was happening on the night of the incident.

In light of the foregoing, we conclude that the trial court's finding that Factor (g) favored defendant was not against the great weight of the evidence.

Next, we disagree with plaintiff that the evidence was not clear and convincing that it was in the children's best interests to change the established custodial environment by granting defendant sole physical and legal custody.

A child has an established custodial environment "if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort." MCL 722.27(1)(c). An established custodial environment is

> a custodial relationship of a significant duration in which [the child is] provided the parental care, discipline, **[*15]** love, guidance and attention appropriate to his age and individual needs; an environment in

both the physical and psychological sense in which the relationship between the custodian and the child is marked by qualities of security, stability and permanence." [*Baker v Baker*, 411 Mich 567, 579-580, 309 NW2d 532 (1981).]

"An established custodial environment may exist in more than one home and can be established as a result of a temporary custody order, in violation of a custody order, or in the absence of a custody order." *Marik v Marik*, 325 Mich App 353, 361; 925 NW2d 885 (2018) (quotation marks and citation omitted). If a proposed change in custody will change the child's established custodial environment, the proponent of the change must prove by clear and convincing evidence that the change is in the child's best interests. See *Shade v Wright*, 291 Mich App 17, 23; 805 NW2d 1 (2010). If the proposed change will not change the child's established custodial environment, the proponent of the change must show by a preponderance of the evidence that the proposed change is in the child's best interests. See *id.*

Given the trial court's unchallenged findings that five of the best-interest factors favored both parties and two of the remaining factors favored defendant, and that the great weight of the evidence supports the trial court's finding that Factors **[*16]** (b) and (g) favored defendant for the reasons previously explained, we conclude that clear and convincing evidence established that the trial court's decision was in the children's best interests.[1] Therefore, the trial court did not abuse its discretion by granting sole physical and legal custody of the children to defendant and granting plaintiff parenting time in accordance with the FOC's parenting-time policy.

III. DUE PROCESS

Plaintiff next alleges several due-process violations. Whether a party has been afforded due process is a question of law reviewed de novo. *Elba Twp v Gratiot Co Drain Comm'r*, 493 Mich 265, 277; 831 NW2d 204 (2013).

A. EX PARTE COMMUNICATIONS

Plaintiff first argues that the trial court violated his right to procedural due process when it received improper, prejudicial ex parte communications from defendant on December 30, 2020, May 21, 2021,[2] and February 18, 2021. Plaintiff also argues that the result of these due-process errors was judicial bias. We are unpersuaded.

Generally, due process in civil cases requires notice of the nature of the proceeding, an opportunity to be heard in a meaningful time and manner, and an impartial decisionmaker. *Hinky Dinky Supermarket, Inc, v Dep't of Community Health*, 261 Mich App 604, 606; 683 NW2d 759 (2004). A trial judge is presumed to be fair and impartial, and any litigant who would challenge this **[*17]** presumption bears a heavy burden to prove otherwise. *In re Susser Estate*, 254 Mich App 232, 237; 657 NW2d 147 (2002). "'[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Cain v Dep't of Corrections*, 451 Mich 470, 496; 548 NW2d 210 (1996), quoting *Liteky v United States*, 510 US 540, 555; 114 S Ct 1147; 127 L Ed 2d 474 (1994).

The Code of Judicial Conduct, Canon 3(A)(4)(e), prohibits a judge from initiating, permitting, or considering ex parte communications unless "expressly authorized by law to do so." In domestic relations cases, a trial court "may issue an ex parte temporary order with regard to any matter within its jurisdiction." MCR 3.207(A). MCL 722.27a(12) expressly authorizes parents involved in a custody dispute to seek an ex parte order regarding parenting time. If the

---

[1] Defendant persuasively argues that granting defendant sole physical and legal custody did not change the established custodial environment—and therefore defendant had to show by only a preponderance of the evidence that granting her sole physical and legal custody was in the children's best interests—because, if the children had an established custodial environment with both parents under the trial court's interim order, there was no reason why an order that essentially made the interim order final would change that. We need not reach this argument, however, given our conclusion that, even under the more demanding clear-and-convincing-evidence standard, plaintiff's argument still fails.

[2] In his statement of the question presented, and throughout his brief to this Court, plaintiff lists the date as May 25, 2021, but it is apparent from the record that the disputed communication took place on May 21, 2021.

court enters an ex parte parenting-time order, "the party on whose motion the ex parte interim order is entered shall have a true copy of the order served on the friend of the court and the opposing party." MCL 722.27a(12).

On December 30, 2020, defendant moved *in propria persona* for an ex parte order regarding parenting time, asking the trial court to suspend plaintiff's parenting time until more could be learned about the incident at plaintiff's **[*18]** house.[3] Despite this case being assigned to Judge Kengis, Allegan Circuit Court Chief Judge Margaret Bakker reviewed the motion because Judge Kengis was on vacation. Canon 3(A)(4) did not prohibit Judge Bakker from considering defendant's motion because the court was "expressly authorized by law to do so." MCL 722.27a; MCR 3.207(A).

Judge Bakker declined to issue the requested order and indicated that the motion could be set for a hearing, but defendant took no further action. While plaintiff alleges that he was not notified of this motion, a party moving for an ex parte order in a domestic relations action is only required to notify the opposing party if the trial court issues an ex parte order in response to the motion. MCR 3.207(B)(2). In such cases, the moving party must serve a true copy of the ex parte order on the nonmoving party, along with notice regarding how the nonmoving party can file an objection to the order and what happens if he or she does not object. MCR 3.207(B)(2) and (5). Nothing in the Code of Judicial Conduct required the trial court to notify plaintiff of the motion because the December 30, 2020 motion was not an improper ex parte communication. Moreover, because the court denied the motion and defendant took no further action, **[*19]** MCR 3.207(B) did not require defendant to notify plaintiff of the motion. For these reasons, plaintiff's claim that the trial court's handling of the December 30, 2020 motion for an ex parte order violated his right to procedural due process must fail.

Plaintiff persists that, even if Judge Kengis did not initially review the December 30, 2020 motion, the judge's impression of plaintiff was colored by the accusations in the motion. This assertion is simply not support by the record—nothing in the record suggests that Judge Kengis formed an opinion about plaintiff on the basis of the allegations in the December 30 motion. Regardless, assuming for the sake of argument that Judge Kengis did form an opinion about plaintiff on the basis of the allegations in the motion, an opinion so formed would not "'constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Cain*, 451 Mich at 496, quoting *Liteky*, 510 US at 555. There is simply nothing in the record to suggest that Judge Kengis displayed a deep-seated favoritism or antagonism towards plaintiff, as will be discussed in more detail in Part III.C.

Turning next to the May 21, 2021 motion, plaintiff asserts **[*20]** that defendant filed the motion before the start of trial that day, that it was "in Judge Kengis's hands" before he could object to it, that it interrupted his cross-examination of defendant, and that the trial court and defense counsel pressured him to limit his cross-examination of defendant to the factual allegations in the motion. This argument is unpersuasive because the underlying facts on which it relies are not borne out by the record.

Contrary to plaintiff's representations, defendant did not file her May 21, 2021 motion before the start of trial or before plaintiff had an opportunity to see it and to object to it. Defendant's attorney gave copies of the motion to the trial court and to defendant at the beginning of that day's proceeding and filed the motion with the clerk during a break in the proceeding. The trial court gave plaintiff time to read the motion while the court conducted a pro confesso hearing in another case, after which plaintiff objected to the motion as hearsay.

Moreover, any interruption in plaintiff's cross-examination of defendant came at plaintiff's insistence, not from the motion or pressure from defense counsel. The trial court suggested that plaintiff **[*21]** finish the cross-examination of defendant and that the parties could address the motion after defendant properly filed it with the court, but plaintiff insisted that the parties address the motion "while we're here." To accommodate plaintiff, the trial court

---

[3] Though the motion stated that it was asking the court to "terminate [plaintiff's] parenting rights," the text of the request makes clear that plaintiff requested a suspension of plaintiff's parenting time. See *Lieberman v Orr*, 319 Mich App 68, 77 n 4; 900 NW2d 130 (2017) (explaining that what parties choose to label their motions does not bind a trial court, which must consider the gravamen of the motion on the basis of reading the document as a whole).

allowed defense counsel to interrupt plaintiff's cross-examination with redirect examination of defendant about the motion. The trial court then allowed plaintiff to cross-examine defendant regarding her direct testimony and the allegations in the motion. Plaintiff proceeded to cross-examine defendant extensively.

In short, nothing in the record supports plaintiff's claim that the trial court's handling of defendant's May 21, 2021 motion violated his right to procedural due process and to a fair trial. There was no improper ex parte communication. Plaintiff had an opportunity to respond to the motion and to cross-examine defendant about the facts alleged in the motion. The trial court did not limit plaintiff's cross-examination of defendant. And any interruption to plaintiff's cross-examination of defendant came at plaintiff's insistence.

Plaintiff also contends that the "ex parte use" of his parenting-time violation complaints in [*22] defendant's February 18th, 2021 PPO continuation request violated his right to due process. This argument ignores that MCL 600.2950 allows a person to move the court for an ex parte domestic PPO, see MCL 600.2950(11)(g) and (12), so the trial judge did not commit an ethical or legal violation by reviewing defendant's request for continuation of the PPO against plaintiff.

Nevertheless, plaintiff asserts that the trial court was biased by the implication that the parenting-time violation complaints were evidence of harassment. As previously explained, however, whatever opinion of plaintiff the trial judge may have formed on the basis of defendant's use of the parenting-time violation complaints is not grounds for moving to disqualify the trial judge in the absence of evidence showing that the judge could not fairly judge the matter before him or her. See *Cain*, 451 Mich at 496. Regardless, the trial court explained that it continued the PPO on grounds other than the parenting-time violation complaints. In addition, the trial court eventually found that the complaints were valid and granted plaintiff makeup parenting time. Considering (1) that there was no improper ex parte communication and (2) that the trial court's rulings on continuation [*23] of the PPO and on the parenting-time violation complaints did not suggest that the trial judge harbored a deep-seated antagonism toward plaintiff, plaintiff has failed to establish a violation of his right to due process and a fair trial arising from defendant's February 18, 2021 request for continuation of the PPO.

Lastly, plaintiff argues that the cumulative effect of the alleged improper ex parte communications denied his right to procedural due process and to a fair trial. Having found no such errors, there can be no cumulative effect of errors warranting reversal. See *People v Dobek*, 274 Mich. App. 58, 106; 732 N.W.2d 546 (2007).

B. PLAINTIFF'S LINKEDIN PROFILE

Plaintiff next asserts that the trial judge violated his right to a fair trial by obtaining extrajudicial information about plaintiff from plaintiff's LinkedIn[4] profile. Plaintiff's claim of error is without merit.

"A court must base its decision on testimony given in open court, not extrajudicial information." *Gubin v Lodisev*, 197 Mich App 84, 86; 494 NW2d 782 (1992). Assuming without deciding that it was improper for Judge Kengis to click on plaintiff's LinkedIn profile while the divorce trial was ongoing, plaintiff has failed to establish that the trial judge improperly considered any information from the profile when rendering his decisions. [*24] After discovering that Judge Kengis had clicked on plaintiff's profile, plaintiff moved to disqualify the judge. During oral argument on this motion, however, plaintiff affirmed that he did not know what was on his profile that might be prejudicial. On appeal, plaintiff still fails to explain what on his profile might have been prejudicial. Plaintiff may not simply announce his position and leave it to this Court to discover and rationalize the basis for their claim. See *Bronson Methodist Hosp v Mich Assigned Claims Facility*, 298 Mich App 192, 199; 826 NW2d 197 (2012). Accordingly, plaintiff has failed to show that Judge Kengis obtained any information from his LinkedIn profile, let alone information that affected his decisions in this case.

C. JUDICIAL BIAS

---

[4] LinkedIn is a social-networking platform that facilitates business connections. As pertinent here, it allows users to view other users' profiles.

Plaintiff also contends that Judge Kengis should have recused himself because of bias against plaintiff stemming from plaintiff's public criticism of Judge Kengis in 2016,[5] when plaintiff was the elected Monterey Township Supervisor, and in 2020, when plaintiff was running for state representative. This claim of error is also without merit. In reviewing claims of judicial bias, this Court generally reviews a lower court's factual findings for an abuse of discretion and its application of the facts to the law de novo. *In re MKK*, 286 Mich App 546, 564; 781 NW2d 132 (2009). "An abuse **[*25]** of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Id.* (quotation marks and citation omitted).

MCR 2.003(C) lists a number of grounds warranting disqualification, including, as relevant here, when a judge is actually biased or prejudiced for or against a party, or when there exists "a serious risk of actual bias impacting the due process rights of a party . . . ." MCR 2.003(C)(1)(a) and (b).

Plaintiff claims that the trial judge was biased against him because of their political differences and plaintiff's public criticism of the judge when he was still the county prosecutor. Plaintiff's public criticisms of the judge were arguably serious, but public officials are routinely criticized in public, and plaintiff's criticisms were not of a kind that would create a serious risk of actual bias—the criticism would not "strike at the most vulnerable and human qualities of a judge's temperament." *Mayberry v Pennsylvania*, 400 US 455, 466; 91 S Ct 499; 27 L Ed 2d 532 (1971). Moreover, plaintiff fails to point to any record evidence suggesting that the trial court harbored a deep-seated antagonism against him such that the judge was actually biased. See *Cain*, 451 Mich at 496. Indeed, rather than being antagonistic towards plaintiff, the trial transcripts show that **[*26]** Judge Kengis was respectful and helpful towards plaintiff. The judge explained to plaintiff how to admit evidence and how to question witnesses without being argumentative, instructed plaintiff on how to phrase his responses to defense counsel's objections, and occasionally explained relevant court rules.

Our review of the record convinces us that plaintiff has not overcome the presumption that Judge Kengis was fair and impartial. See *In re Susser Estate*, 254 Mich App at 237. Nor has plaintiff shown that Judge Kengis's decisions were informed by anything other than the facts introduced during plaintiff's divorce proceedings or that Judge Kengis harbored opinions about plaintiff or defendant that "display[ed] a deep-seated favoritism or antagonism that would make fair judgment impossible." See *Cain*, 451 Mich at 496 (quotation marks and citation omitted). For these reasons, we conclude that the trial judge did not abuse his discretion by declining to recuse himself. Plaintiff's claim of a due-process violation arising from judicial bias fails.

IV. MENTAL HEALTH RECORDS

Lastly, plaintiff argues that the trial court erred by ruling that defendant's mental health records were privileged. We disagree. The applicability of a privilege is a question of **[*27]** law, which we review de novo. *Baker v Oakwood Hosp Corp*, 239 Mich App 461, 468; 608 NW2d 823 (2000).

Michigan generally follows a policy of open and broad discovery that entitles a party to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action . . . ." MCR 2.302(B)(1). Psychologist-patient communications for treatment purposes are privileged. MCL 333.18237. When the mental condition of a party is "in controversy," information about the condition is subject to discovery as long as it is otherwise discoverable under MCR 2.302(B) and the party from whom the records are sought "does not assert that the information sought is subject to a valid privilege." MCR 2.314(A)(1).

Plaintiff first implies that he was entitled to the defendant's mental health records because mental and physical health are best-interest factors that the trial court was required to consider when making its custody determination. This Court rejected a similar argument in *Navarre v Navarre*, 191 Mich App 395, 398; 479 NW2d 357 (1991), holding that the Legislature did not intend to suspend the medical privilege in custody cases, reasoning as follows:

> All privileges exist at the expense of suppressing valuable evidence. Indeed, were this not the case, there would be no need for privileges at all. In this context, potentially valuable **[*28]** evidence regarding the

---

[5] Judge Kengis was the Allegan County Prosecuting Attorney at the time.

condition of the parties to a custody dispute must be sacrificed to the perceived greater good of protecting physician-patient relationships. [*Id.* at 399.]

Although *Navarre* addressed the physician-patient privilege, the reasoning in *Navarre* extends to the psychologist-patient privilege. For the reasons articulated in *Navarre*, we reject plaintiff's contention that he is entitled to defendant's mental health records because the parties' mental and physical health are factors to consider when making a custody determination.

Plaintiff also asserts that he is entitled to defendant's mental health records because she "raised the issue of mental health." This is incorrect. Plaintiff asserted in his complaint for divorce that he was the "fit and proper person to have sole physical custody of the parties' minor children." Defendant denied that allegation, in part on the basis that plaintiff had "mental and emotional health issues." Defendant's denial did not put *defendant's* mental health "in controversy" for purposes of MCR 2.314(A)(1).

Nor did plaintiff put defendant's mental health at issue with his motion to compel the production of her mental health records. During oral argument on plaintiff's **[*29]** motion to compel, plaintiff asserted that he wanted all of defendant's mental health records, not only the ones he knew about. He explained that he wanted anything that contained a diagnosis, and he wanted to cross-examine the clinicians who made the diagnoses. Plaintiff restated defendant's testimony that she did not know what her mental health records contained and said, "well let's see."

Despite Michigan's broad discovery policy, a party is not entitled to obtain "medical information" about a party's "mental or physical condition" unless that party's mental or physical condition "is in controversy." MCR 2.314(A)(1). Further, Michigan's commitment to open and far-reaching discovery does not encompass fishing expeditions. *Augustine v Allstate Ins Co*, 292 Mich App 408, 419-420; 807 NW2d 77 (2011). Plaintiff's argument in support of his motion to compel the production of defendant's mental health records shows that he was simply fishing for anything that he might use against defendant. Plaintiff did not establish that he was entitled to defendant's mental health records by alleging or presenting any evidence tending to suggest that defendant suffered from a mental health condition that could affect her ability to parent. Moreover, the record shows that the trial court had **[*30]** adequate opportunity to examine the parties' mental health for purposes of determining the children's best interests. For these reasons, we conclude that the trial court did not abuse its discretion by denying plaintiff's motion to compel production of defendant's mental health records.

Affirmed.

/s/ Michelle M. Rick

/s/ Mark T. Boonstra

/s/ Colleen A. O'Brien

**End of Document**